# UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Janelle Jones,** | : |
| Plaintiff, | : Civil Action No. |
| v. | : |
| **First Advantage Background Services Corp.,** | : |
| Defendant. | : |

## COMPLAINT AND JURY DEMAND

This is an action for damages brought by an individual consumer against Defendant (named below) for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (the "FCRA").

### Introduction

1. Consumer reports provide information bearing on, among other things, a consumer's credit worthiness, character, general reputation, personal characteristics and mode of living.

2. Consumer reports are meant to enable creditors and other providers of consumer services to make informed risk decisions about new applicants and existing customers. These reports are used to make decisions having to do with insurance, housing, employment, credit and more.

3. In order to obtain data to create consumer reports, consumer reporting agencies ("CRAs") utilize data technology which allows the near instantaneous flow of information to consumer reporting agencies. This timely information is intended to lead to faster and better decision-making by its recipients.

4. What would appear to be a benefit of technology, however, has had the opposite effect on consumers, and has led to mishandling and misuse of information.

5.     Early on Congress understood the dire consequences of inaccurate credit reporting and enacted the FCRA to "ensure that consumer reporting agencies exercise their grave responsibilities with fairness". See 15 U.S.C. § 1681(a).

6.     In order to effectuate its goal of accurate credit reporting, among other things, Congress mandated that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy" of the information it reports. See 15 U.S.C. § 1681e(b).

7.     Despite the law, CRAs, like Defendant, continue to inaccurately report credit information resulting in significant harm to consumers, which can include denial of insurance, housing, employment, and credit.

8.     First Advantage Background Services Corp. ("First Advantage" or "Defendant") places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to providing them to Defendant's customers.

9.     First Advantage reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate information.

10.    Thus, to further its own economic ends, the Defendant does not employ reasonable procedures to assure the maximum possible accuracy of information it reports regarding consumers and fails to ensure that the information it reports relates to the appropriate consumer to which it should be associated.

11.    As the Brookings Institution explained, "[w]ith money on the line, you might assume that the credit reporting system would fix the problem. In reality it is the opposite. Speed and volume are favored over accuracy. Large-scale inaccuracies are tolerated. The costs of correcting the data outweigh benefits — for the credit bureaus, though, not the consumers…Given the importance of credit scores, why are they so inaccurate? Three reasons: size, speed, and

economic incentives of the system."

12. This situation is no exception. As discussed further below, First Advantage provided a mixed credit report to Avalon Laurel, an apartment complex that Plaintiff Janelle Jones ("Ms. Jones" or "Plaintiff") hoped to lease an apartment from. The First Advantage report was used to evaluate Plaintiff's eligibility for an apartment. The First Advantage report included five different eviction actions that were filed against a person with the same last name as Plaintiff. After reviewing the mixed credit report from First Advantage, Plaintiff was informed that she was not eligible for an apartment because of the reported eviction actions.

13. Ms. Jones was embarrassed and confused as she had never been evicted from any property.

14. The policies and procedures of Defendant could not have been reasonable because, among other reasons, a cursory review of the personal identifying of the individual who had the eviction actions did not match that of Plaintiff.

15. Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking opportunities by prejudicing prospective landlords with inaccurate information.

16. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; loss of time and money; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

17. Accordingly, as discussed further below, Plaintiff alleges violations of Section 1681e(b) of the FCRA against Defendant for inaccurately reporting eviction actions belonging to another individual.

**Jurisdiction and Venue**

18. Jurisdiction of this Court arises under 15 U.S.C. § 1681p, and 28 U.S.C. §1331,

1337.

19.     Venue lies properly in this district pursuant to 28 U.S.C. §1391(b).

## Parties

20.     Ms. Jones is an adult individual who resides in Laurel, MD.

21.     Defendant First Advantage is a business entity that is registered to do business in the Commonwealth of Pennsylvania and regularly conducts business in the Eastern District of Pennsylvania, with principal place of business located at 1 Concourse Parkway NE, Suite 200, Atlanta, GA 30328. First Advantage is known as a CRA under the FCRA.

## Facts

### Purpose of the FCRA

22.     Understanding the dire consequences of inaccurate credit reporting, Congress enacted the FCRA. One of the primary purposes of the FCRA is to require CRAs to assure "maximum possible accuracy" of consumer information to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

23.     The preservation of one's good name and reputation is also a foundational principle of the FCRA:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and

> make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

Bryant v. TRW, Inc., 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)].

24. Thus, in order to further its objectives, embedded within the FCRA is the requirement that CRAs conduct a reasonable investigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted.

25. Defendant failed to institute or adhere to policies and procedures that could have prevented the reporting of the mixed in information.

## Credit Reporting Industry Operations

26. First Advantage regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

27. The sources are known as "furnishers" within the credit reporting industry and under the FCRA.

28. First Advantage collects information from thousands of furnishers.

29. The process by which First Advantage receives, sorts, and stores information is largely electronic.

30. First Advantage has consumer files on more than 200 million consumers.

**<u>Mixed File Problems of the Consumer Reporting Industry</u>**

31. Defendant is well aware that different consumers can have similar names.

32. Defendant also knows that different consumers can have similar Social Security numbers, birthdays and other personal identifying information.

33. Defendant matches tradelines and public records to a consumer file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer file.

34. Sometimes Defendant's matching algorithms associate information belonging to one consumer to the consumer file of another consumer; resulting in what is commonly known in the industry as a mixed or merged file.

35. A mixed or merged credit file is the result of Defendant inaccurately mixing personal identifying information, public record information, credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer. See <u>F.T.C. v. TRW, Inc.</u>, 784 F. Supp. 361, 362 (N.D. Tex. 1991) (The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is the subject of that Consumer Report.")

36. Mixed files are not a new phenomenon.

37. First Advantage has a long-standing and specific knowledge of the mixed file problem.

38. There are many different possible causes for a mixed credit file but all of them relate in one way or another to the algorithms (the database rules) used by the Defendant to match personal identifying information and tradeline information, as well as public record information,

to a particular consumer's consumer file.

39. The success or failure of these algorithms and rules is both a function of the rules themselves and of the information provided by the furnishers of the information to the Defendant.

40. These rules also determine which credit files are selected by the algorithm and are merged to create a complete consumer report.

41. Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumers' information belonging to different consumers into one consumer report.

### The Consumer Reporting Industries Long History of Mixed Credit Files

42. First Advantage has been on notice for decades of the existence of mixed files and the fact that procedures for creating consumer files, including matching algorithms, are prone to frequently caused errors. See Thompson v San Antonia Retail Merchants Ass'n, 682 F.2d 509, 511 (5th Cir. 1982).

43. For instance, on January 9, 2020, the Eleventh Circuit affirmed a $250,000 compensatory damages award and reduced a $3.3 million punitive damages award to $1 million against First Advantage relating to its mixing of records of the plaintiff with another individual. See Williams v. First Advantage Background Services Corp., 947 F.3d 735 (11th Cir. 2020).

44. "Mixed files" create a false description and representation of a consumer's consumer history.

45. Moreover, mixed files result in the disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge, consent, or both.

46. First Advantage has been sued thousands of times wherein an allegation was made that it violated the FCRA. Moreover, the Defendant is sued, approximately a hundred times each year wherein an allegation is made that it mixed a consumer's credit file with that of another

7

person.

47. Private FCRA lawsuits have resulted in significant settlements and verdicts for consumers who fall victim to a mixed credit file.

48. "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." Dalton v. CAI, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

49. No less than three federal Courts of Appeal have held that a CRA violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another individual.

50. Finally, the FTC has specifically warned CRAs to review their procedures when a mixed file case occurs.

51. Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed consumer files remain a significant problem for Defendant, as well as innocent consumers, including Plaintiff.

**Case Background**

52. In or about August 2025, Ms. Jones was searching for an apartment.

53. Ms. Jones toured the Avalon Laurel apartment complex (the "Avalon Laurel") and submitted a rental application hoping to make that residence her new home.

54. On or about August 27, 2025, Ms. Jones was notified that she was denied for an apartment at the Avalon Laurel.

55. The denial was based on information obtained from a First Advantage consumer report that was provided to property management at the Avalon Laurel.

56. The reason for the Apartment denial was "Evictions Records Match".

57. Ms. Jones received a copy of her First Advantage report which included approximately five (5) different filed eviction actions (the "Evictions" or the "Inaccurate Information") for a "Janet Jones" who lived at an apartment complex called the Evolution at Towne Center between 2020-2023.

58. Plaintiff had never lived at the Evolution at Towne Center and her first name is Janelle, not Janet.

59. Further the historical address information contained within the First Advantage report does not include the Evolution at Towne Center address as a prior residence of Plaintiff.

60. The Evictions plainly do not belong to Plaintiff but another individual that has a different name.

61. Ms. Jones disputed the Evictions with First Advantage informing Defendant that the information reported about her was inaccurate.

62. Although Defendant ultimately removed the eviction information, Defendant should have never reported this information as it did not belong to Ms. Jones. A cursory review of the Inaccurate Information would have confirmed this fact.

63. Defendant failed to institute or adhere to policies and procedures that could have prevented the reporting of the inaccurate information. The consumer to whom the eviction information belonged to certainly has a different social security number, middle name, and other

relevant identifying information. If such information was not available to Defendant to confirm the accuracy of the Evictions, the Evictions should not have been reported.

64. Defendant knew or should have known that its actions violated the FCRA. Additionally, the Defendant could have taken the steps necessary to bring its agents' actions within compliance of the statutes but neglected to do so and failed to adequately review those actions to ensure compliance with said laws.

65. Plaintiff's consumer reports and file have been obtained from the Defendant and have been reviewed by prospective and existing credit grantors of housing, and the inaccurate information has been a substantial factor in precluding Plaintiff from receiving housing opportunities, known and unknown.

66. As a result of the Defendant's violations of the law, Ms. Jones suffered interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, fear, worry, anxiety, and embarrassment attendant to her disputes.

### Count One – Violations of the FCRA
### Plaintiff v. First Advantage

67. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

68. At all times pertinent hereto, First Advantage was a "person" and a "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

69. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

70. At all times pertinent hereto, the above-mentioned consumer reports are the same as that term is defined by 15 U.S.C. § 1681a(d).

71. First Advantage has violated numerous provisions of the FCRA for its improper actions, including but not limited to Sections 1681e(b) and 1681i(a) of the FCRA. First Advantage willfully and negligently violated the FCRA and is liable for damages to Plaintiff pursuant to Section 1681n and 1681o of the FCRA.

72. The conduct of First Advantage was a direct and proximate cause, as well as a substantial factor, in bringing about the actual damages and harm to Plaintiff that are outlined more fully above and, as a result, Defendant is liable to Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorneys' fees and the costs of litigation, as well as such further relief, as may be permitted by law.

## JURY TRIAL DEMAND

73. Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment in Plaintiff's favor and damages against the Defendant, based on the following requested relief:

  a. Actual damages;

  b. Statutory damages;

  c. Punitive damages;

  d. Costs and reasonable attorneys' fees; and

  e. Such other relief as may be necessary, just and proper.

                      **THE KIM LAW FIRM, LLC**

BY:    */s/ Richard H. Kim*
          Richard Kim, Esquire
          1515 Market St., Suite 1200
          Philadelphia, PA 19102
          Ph. 855-996-6342/Fax 855-235-5855
          rkim@thekimlawfirmllc.com

          *Attorney for Plaintiff Janelle Jones*

Date: December 16, 2025